U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 OCT 19 AM 9:20

CLERK

BY ________
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| WHITNEY TUMMINGS,<br>Plaintiff,<br><br>v.<br><br>CHAMPLAIN VALLEY OFFICE OF ECONOMIC OPPORTUNITY, VERMONT DEPARTMENT OF CHILDREN AND FAMILIES, and JOHN DOES 1–5,<br>Defendants. | ) | Case No. 2:26-cv-156 |

**ORDER**
(Docs. 5, 15, and 27)

Plaintiff Whitney Tummings, appearing *pro se*, filed this action against the Champlain Valley Office of Economic Opportunity ("CVOEO"), the Vermont Department for Children and Families, Economic Services Division ("ESD"), and five unnamed individual employees of CVOEO and/or ESD. (Doc. 4.) Ms. Tummings alleges Defendants wrongfully denied her access to federally funded heating fuel assistance, weatherization services, and home-heating repair assistance over a period of approximately five years. (*Id.* at 1, 3.) She asserts claims under 42 U.S.C. § 1983, Title VI, the Low-Income Home Energy Assistance Program ("LIHEAP"), the Weatherization Assistance Program ("WAP"), the Fourteenth Amendment, and Vermont law, alleging that Defendants' denials were discriminatory, retaliatory, and procedurally improper. (*Id.* at 1, 6–7.)

On the same day she filed the Complaint, Ms. Tummings moved for a temporary restraining order and preliminary injunction requiring Defendants to provide emergency heating assistance, authorize and fund repair or replacement of her water heater, restore access to federally funded heating and weatherization programs, and refrain from adverse action relating to a reversed

fraud determination. (Doc. 5 at 1, 3.) After the court issued an order requesting clarification, (Doc. 7), Ms. Tummings filed a supplemental statement seeking *ex parte* relief under Rule 65(b), (Doc. 8). Because Ms. Tummings did not establish a likelihood of success on the merits of her claims or demonstrate an imminent threat that would cause immediate and irreparable harm, the court denied the *ex parte* temporary restraining order. (Docs. 9, 10.) The court deferred ruling on the Motion for Preliminary Injunction. (Doc. 10 at 7.)

On July 7, 2026, Defendant ESD filed a Motion to Dismiss the Complaint for failure to state a claim. (Doc. 15.) On July 30, 2026, Defendant CVOEO filed a Motion to Dismiss for failure to state a claim. (Doc. 27.) Plaintiff filed responses in opposition to both motions. (Docs. 18, 29, 32.) Ms. Tummings also filed a supplemental brief in support of her motions. (Doc. 21.) The court held a hearing on the preliminary injunction and the motions to dismiss on September 24, 2026.

## Factual Background[1]

Ms. Tummings has applied for both the LIHEAP and WAP services on multiple occasions, believing she met all eligibility criteria. (Doc. 4 at 3, ¶ 8.) According to the Complaint, these applications were denied as part of a broader pattern of race-based discrimination and retaliation. (*Id.* at 3, ¶ 10.)

The ESD is tasked with the administration of LIHEAP, a seasonal fuel assistance program intended to "secure the safety and health of low-income households by providing needy Vermonters with assistance for the purchase of essential home heating fuel." Vt. Stat. tit. 33, § 2601. Pursuant to 33 V.S.A. § 2602(b), the Secretary of Human Services, the agency under which the ESD operates, adopted the Seasonal Fuel Rules to implement the LIHEAP program. Vt.

---

[1] For the limited purpose of ruling on the pending motions to dismiss and motion for preliminary injunction, the factual allegations set forth on the record will be accepted as true.

Stat. tit. 33, § 2602(b). These rules set the eligibility to receive seasonal fuel assistance. Vt. Dep't for Child. & Fams. Econ. Servs. Div., *Seasonal Fuel Assistance Rules*, Agency Hum. Servs. (June 6, 2024), https://outside.vermont.gov/dept/DCF/Shared%20Documents/ESD/Rules/2900-Seasonal-Fuel-Assistance.pdf?_gl=1*z3rxb3*_ga*MTEyMjc3NTI3My4xNzgxMDE0NDU1*_ga_V9WQH77KLW*czE3ODMzNDMxOTIkbzEyJGcwJHQxNzgzMzQzMjAwJGo1MiRsMCRoMA [https://perma.cc/35CA-47P6]. The eligibility criteria include that (1) "[a]ll the members of a household must be Vermont residents at the time of application for fuel assistance," (2) "[a] household member must be a citizen or national of the United States or a qualified immigrant under rule 2907," (3) "[t]he total gross income for all fuel household members must not exceed 185% of the federal poverty guidelines based on household size," and (4) "[t]he head of household must spend at least 150 non-consecutive nights in their living unit between November 1 and April 30." *Id.* § 2903(a). Separately, the Home Weatherization Assistance Program is administered through the CVOEO, a nonprofit organization providing a range of services, including the delivery of both WAP and LIHEAP benefits. (Doc. 27 at 5; *see also* Vt. Stat. tit. 33, § 2502.)

Ms. Tummings submits she is a low-income homeowner currently residing at 652 Bean Road, Colchester, Vermont. (Doc. 4 at 2, ¶ 4.) She alleges that, although she has applied for the LIHEAP and WAP programs repeatedly since 2021, Defendants have consistently denied her applications. (*Id.* at 3, ¶¶ 8–10.)

Following these denials, Ms. Tummings contacted Vermont Gas to provide heating and perform necessary repairs. (*Id.* at 3, ¶ 13.) Vermont Gas performed the repairs and billed Ms. Tummings, who was unable to afford the cost. (*Id.* at 3, ¶ 14.) Because the bill remains unpaid, Vermont Gas has allegedly declined to provide any further services to her home. (*Id.* at 4, ¶ 15.)

Ms. Tummings further alleges that the lack of heat and hot water has led to the deterioration of her home, including burst water pipes and total heating system failure. (*Id.* at 4, 5, ¶¶ 17, 27.) Consequently, she contends her home has become unsanitary and poses a significant health risk. (*Id.* at 5, ¶ 28.)

Driven by these conditions, Ms. Tummings relocated to a family member's residence. (*Id.* at 5, ¶ 29.) As a result of this relocation, she was absent from her home for a period that precluded her from meeting the 150-night residency requirement for the November-to-April window. (*See id.*)

The ESD subsequently denied Ms. Tummings' LIHEAP benefits based on her lack of eligibility. (Doc. 15 at 2.) Ms. Tummings appealed this denial to the Vermont Human Services Board ("HSB"). Following a hearing on May 15, 2026, the HSB affirmed the decision to deny Ms. Tummings's application for LIHEAP benefits. *See In re Tummings*, FH-B-02/26-157 (May 15, 2026).[2]

The record further reveals that Defendants requested information regarding Ms. Tummings' continued residence, including an inquiry in January 2026 regarding a "for sale" sign placed on her property. (Doc. 21 at 9.)[3] At the hearing, Ms. Tummings clarified she had attempted

[2] Pursuant to Federal Rule of Evidence 201(b), the court takes judicial notice of the Vermont Human Services Board Hearing. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (observing that "courts routinely take judicial notice of documents filed in other courts"). If Plaintiff timely requests within fourteen days of this Order, she shall have an opportunity to be heard on whether judicial notice is proper. *See* Fed. R. Evid. 201(e).

[3] At the hearing, Plaintiff sought to introduce several exhibits containing email correspondence between the parties. Defendants argued they were inadmissible hearsay. The court deferred ruling. The court may rely on hearsay evidence in considering a request for a preliminary injunction. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). The court will admit Plaintiff's Exhibits A-E (Doc. 21 at 5-10). The court has considered them in connection with the motions.

to sell the property due to the lack of heat and functioning water but was unable to find a buyer because of the home's condition.

Communications submitted by Ms. Tummings indicate that CVOEO did not deny her weatherization services and she was on a waitlist. (*Id.* at 5, 8.) Ms. Tummings was also provided with a list of necessary repairs, including rewiring the home and installing sheetrock, that she was required to finish before weatherization services could be performed. (*Id.* at 8.) The emails clarify that CVOEO cannot fund major home repairs. (*Id.*) The court has no evidence of whether these tasks were completed.

On May 7, 2026, Ms. Tummings filed an action in this court alleging Defendants had violated 42 U.S.C. § 1983, Title VI, LIHEAP, WAP, the Fourteenth Amendment, and Vermont law. (Doc. 4 at 1.) She requested a preliminary injunction ordering the Defendants to provide heating and weatherization services and repair the water heater. (*Id.* at 7–8.) She also requests damages that will cover the cost of the burst pipes, the water heater repair or replacement, the Vermont Gas debt, the cost of displacement from her home, the cost of lost government contracting revenues caused by the false fraud determination, and damages for emotional distress suffered. (*Id.*)

## Conclusions of Law

### A. Motion for Preliminary Injunction

#### 1. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 66–67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "Its purpose 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024)

(quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A party seeking a preliminary injunction must generally establish a likelihood of success on the merits, a likelihood of irreparable harm if preliminary relief is not granted, "that the balance of [hardships] tips in [the movant's] favor, and that an injunction is in the public interest." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax*, 62 F.4th at 667).

There are certain situations where the "likelihood of success" and "irreparable harm" standard becomes stricter and requires a showing of "*clear or substantial* likelihood of success on the merits" and "a *strong showing* of irreparable harm." *Daileader*, 96 F.4th at 356 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). One such circumstance is where "an injunction will alter, rather than maintain, the status quo." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995). An injunction that alters the status quo is a mandatory injunction. *JTH Tax*, 62 F.4th at 667. "The status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (citation modified). In an effort to preserve the status quo "a court may require the parties to act or to refrain from acting." *LaRouche v. Kezer*, 20 F.3d 68, 74 (2d Cir. 1994). The heightened standard is also required when an injunction would grant the movant substantially all the relief sought. *Actavis*, 787 F.3d at 650; *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

As previously discussed in the order denying the temporary restraining order, (Doc. 10 at 3), the granting of preliminary relief in this case would alter the status quo and grant Plaintiff substantially all the relief sought. Ms. Tummings seeks an order compelling the Defendants to act by providing emergency heating assistance, authorizing and funding repairs or a replacement of her water heater, restoring her access to federally funded heating and weatherization programs,

and refraining from initiating any action relating to a reversed fraud determination. (Doc. 5 at 1, 3.)

**2. Irreparable Harm**

For a court to grant "a preliminary injunction, the [movant] must demonstrate that the order is necessary to prevent irreparable harm." *Veale v. U.S. Dep't of Just.*, No. 1:05-CV-105, 2005 WL 8154703, at *1 (D. Vt. Dec. 27, 2025). A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (citation modified). "This requirement must therefore be satisfied before the other requirements for an injunction can be considered." *Id.* (citing *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation modified). Irreparable harm is an injury "for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc.*, 60 F.3d at 37 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). An "[i]rreparable injury is one that cannot be redressed through a monetary award." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

Under the ordinary standard required for a prohibitory injunction, the movant must show that the harm, is "not only possible, but likely." *Daileader*, 96 F.4th at 358 (citation modified). The heightened standard requires the movant to make a strong showing that they will be irreparably harmed. Since a granting of preliminary relief, in this case, would require Defendants to act and

provide services they would otherwise not provide, Ms. Tummings needs to make a *strong* showing of irreparable harm. Her burden here is substantial.

Ms. Tummings contends her home lacks functioning hot water and adequate heat, her water heater has failed, and her pipes have burst. (Doc. 5 at 2; Doc. 8 at 2; Doc. 21 at 2.) She argues these conditions have exacerbated the property's current deterioration and threaten to cause additional harm. (Doc. 5 at 2.) She also asserts that continued occupancy of the property poses health and sanitation risks. (*Id.* at 2–3.)

Defendants respond that Ms. Tummings' injuries are compensable through money damages and therefore do not constitute irreparable harm. (Doc. 22 at 5.) Specifically, they contend that her alleged injuries arise from the denial of funds needed to repair her home and pay for heating services. (*Id.*)

Ms. Tummings argues that characterizing her injuries as "purely financial" is a mischaracterization because she has suffered physical damage to her property and emotional harm from being displaced from her home during the winter and deprived of running water. (Doc. 23 at 3.) These allegations, however, do not establish the type of irreparable harm required to obtain preliminary injunctive relief.

The relevant inquiry is not whether Ms. Tummings has experienced harm beyond a dollar-for-dollar financial loss. Rather, Ms. Tummings must show her alleged injuries cannot be adequately remedied through an award of money damages. Ms. Tummings' filings and representations in court describe concerning living conditions. The court does not minimize the significance of her allegations. The injuries Ms. Tummings identifies, including the cost of repairing her home, obtaining heat and running water, and addressing other consequences of the property's condition, are capable of being redressed through monetary compensation. Although

these injuries may have also caused emotional distress, they do not, without more, render money damages inadequate.

Moreover, much of the harm Ms. Tummings alleges has already occurred. She contends that the property has sustained damage, that she has been deprived of essential services, and that she has experienced the resulting displacement during the winter months and hardship. Those past injuries cannot be prevented through a preliminary injunction. They may be addressed, if appropriate, through an award of damages or other final relief. Any allegation of future harm is speculative on this record and does not establish an imminent threat of irreparable injury.

The duration of the alleged conditions further weighs against a finding of imminence. According to Ms. Tummings, these circumstances have persisted for approximately five years. This extended period does not, by itself, defeat a claim of irreparable harm. There is not, however, a sufficient showing of immediate threat which warrants extraordinary preliminary relief. Accordingly, Ms. Tummings has not demonstrated that she is likely to suffer imminent harm.

**3. Likelihood of Success on the Merits**

Although the absence of irreparable harm is independently sufficient to deny Ms. Tummings request for preliminary injunctive relief, the court will also address the remaining requirements. Doing so provides a complete analysis of Ms. Tummings' motion and reflects the court's consideration of the substance of her claims. As discussed further below, Ms. Tummings has not demonstrated a likelihood of success on the merits.

To be granted a mandatory preliminary injunction, a plaintiff must show a clear and substantial likelihood of success on the merits. *See Tom Doherty Assocs., Inc.*, 60 F.3d at 33–34. A movant does not need to show they are likely to succeed on the merits of all asserted claims so long as they show a likelihood of success on at least one claim that would entitle them to the relief

sought. *See Red Earth LLC v. United States*, 657 F.3d 138, 144–45 (2d Cir. 2011) (per curiam) (affirming a grant of a preliminary injunction despite the lower court finding that plaintiffs were unlikely to prevail on most claims).

Ms. Tummings raises eight claims against the CVOEO and ESD under 42 U.S.C. § 1983, 42 U.S.C. § 1981, Title VI, LIHEAP, the Weatherization Assistance Program ("WAP"), the Fourteenth Amendment, and Vermont law. (Doc. 4 at 6–7.) She alleges that Defendants denied her federally funded heating fuel assistance, weatherization services, and home-heating repair assistance and that they did so for discriminatory and retaliatory reasons and without following proper procedures. (*Id.*)

**a. Constitutional Claims**

**i. Claims Under 42 U.S.C § 1983 and the Equal Protection Clause**

Ms. Tummings raises claims under the Fourteenth Amendment's Equal Protection Clause and Due Process Clause. Under the Fourteenth Amendment, citizens enjoy the "right not to be deprived of property by any state without due process of law," but that right "is violated only 'by conduct that may be fairly characterized as state action.'" *Barrett v. Harwood*, 189 F.3d 297, 301 (2d Cir. 1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982)).

As a threshold requirement for constitutional claims under 42 U.S.C. § 1983, a plaintiff must establish that there was state action. *See, e.g.*, *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is . . . required to show state action." (internal quotation marks and citations omitted)). The state action doctrine requires "both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State . . . and . . . [by] a person who may fairly be said to be a state actor." *Id.* at 206 (citation omitted).

To "establish a deprivation of property, a plaintiff must show that a person acting under color of any state statute, regulation, custom or usage deprived plaintiff of a right secured by the Constitution." *Barrett*, 189 F.3d at 301 (citing 42 U.S.C. § 1983). The state action requirement of the Fourteenth Amendment and the § 1983's "under color of state law" requirement are the same. *See Lugar*, 457 U.S. at 929.

ESD, as a state agency, is undoubtedly a state actor. CVOEO, however, is a Vermont nonprofit organization that administers services, including the WAP and LIHEAP programs.

In determining whether a private entity has acted under color of state law, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). The fact that a business is subject to state regulation does not, by itself, convert its actions into state action. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). To attribute a private entity's actions to the state, a plaintiff must allege that:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) . . . the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the State" or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) . . . the entity has been delegated a public function by the State, ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)) (citation modified).

"The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)) (citations omitted). The Second Circuit instructs courts to focus

on the "specific conduct of which the plaintiff complains," rather than on the "general characteristics of the entity." *See id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S.40, 51 (1999)).

In *Fabrikant*, the Second Circuit held that an animal rescue's spaying and neutering of dogs constituted state action because those activities were part of the state's animal-control function, which the state had delegated to the rescue. *Id.* at 208. The Second Circuit emphasized, however, that a "private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" *Id.* at 207 (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)). Rather, the nexus between the private entity and the state must be sufficiently close that the state becomes "*responsible* for the specific conduct of which the plaintiff complains." *Id.* (quoting *Cranley*, 318 F.3d at 111).

Similarly, in *Blum v. Yaretsky*, the Supreme Court held the state was not "responsible" for a nursing home's decisions to transfer patients to other facilities because "[t]hose decisions ultimately turn[ed] on medical judgments made by private parties according to professional standards that [were] not established by the State." 457 U.S. at 1009. A United States District Court in the Middle District of Pennsylvania recently considered whether a nonprofit coalition that had been statutorily designated to administer and distribute grant funding to local shelters was a state actor. *Crisis Ctr. N., Inc. v. Pa. Coal. Against Domestic Violence*, No. 1:26-cv-01015, 2026 WL 2137131, at *2 (M.D. Pa. July 23, 2026). The court held that the plaintiff had sufficiently pleaded state action because the nonprofit was structured by the state to serve as the primary and official conduit for public funds and followed specific state-directed mandates concerning the

recipients of those funds. *Id.* at *9. Although *Crisis Ctr. N.* is not binding on this court, its analysis is persuasive for evaluating a nonprofit charged with distributing federal public funds.

Here, the Complaint alleges CVOEO is the agency responsible for administering the "federally funded LIHEAP and WAP programs in Chittenden County." (Doc. 4 at 2–3, ¶ 5.) Defendant CVOEO does not dispute this characterization. The Complaint, however, goes on further to state "CVOEO acts under color of state law." (*Id.* at 3, ¶ 5.) Additionally, Ms. Tummings alleges CVOEO "wrongfully denied [her] repair claim" and has continued to deny her requests for heating assistance, weatherization, and repair help for years. (*Id.* at 2.). CVOEO disputes these allegations. It contends that it facilitates the benefits but does not make the individual eligibility determinations. Further, CVOEO attests it does not implement state policy, has no authority over Ms. Tummings, nor has it deprived her of a statutory entitlement.

Even viewed in the light most favorable to Ms. Tummings, the evidence does not establish a sufficiently close nexus between the state and CVOEO's challenged conduct. The only evidence Ms. Tummings identifies is that CVOEO is the agency responsible for administering the WAP and LIHEAP programs. (Doc. 4 at 2–3, ¶ 5.) Unlike the nonprofit organization in *Crisis Ctr. N., Inc.*, CVOEO is not alleged to make any grant decisions or determine which individuals are entitled to receive benefits. CVOEO's administration of the funds, without more, does not establish that its actions are attributable to the state. Accordingly, Ms. Tummings has not demonstrated a likelihood of success on the constitutional and § 1983 claims against CVOEO.

The court now turns to the claims against ESD. The Equal Protection Clause requires "that the government treat all similarly situated people alike." *Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 49 (2d Cir. 2018). "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against [her] on the basis

of [her] race." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) (citing *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)). "There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." *Id.* Ms. Tummings is not challenging the eligibility requirements but argues her claim as "selective enforcement."

To allege a selective enforcement claim under the Equal Protection Clause, a plaintiff needs to show that:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)).

Viewing the evidence in the light most favorable to Ms. Tummings, the court cannot conclude that she has made a showing of clear or substantial likelihood of success on her Equal Protection claim against ESD. Ms. Tummings alleges ESD's denial of the LIHEAP heating fuel assistance and WAP Weatherization services is, "not based on legitimate eligibility determinations," but "reflect[s] a pattern of discriminatory and retaliatory conduct targeting Plaintiff on the basis of her race and her prior exercise of administrative appeal rights." (Doc. 4 at 3, ¶¶ 8–10.) She makes no factual allegations that she was treated differently than anyone else. Further, Ms. Tummings acknowledges that she did not meet the eligibility requirements to receive the LIHEAP heating or WAP weatherization services.

#### ii. Procedural Due Process Claim

Ms. Tummings' final constitutional claim against ESD arises from alleged violations of the procedural Due Process Clause of the Fourteenth Amendment. (*Id.* 7, ¶¶ 46–47.) Ms.

Tummings claims ESD denied her these services "without adequate notice, without accepting Plaintiff's documentation in good faith, and without constitutionally sufficient process." (*Id.* at 7, ¶ 47.)

The Fourteenth Amendment provides no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. The Due Process Clause guarantees only that a constitutionally protected interest will not be infringed upon without due process of law. *See Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 464–65 (2d Cir. 2006). To assert a successful Due Process Claim under the Fourteenth Amendment, a plaintiff needs to show that:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). To assert a protected property interest, a plaintiff must allege more than "an abstract need or desire" or a "unilateral expectation" of the property interest but instead must allege that it has "a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "Such property interests cannot be found on the face of the Constitution, but rather 'are created, and their dimensions are defined by, existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.'" *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (quoting *Roth*, 408 U.S. at 577).

To determine whether a "plaintiff has a claim of entitlement," district courts look to the "applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994). While state law defines the underlying property

interest, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (quoting *Roth*, 408 U.S. at 577). "Social welfare benefits have long been afforded constitutional protection as a species of property protected by the federal Due Process Clause." *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005) (citing *Goldberg v. Kelly*, 397 U.S. 254, 262 & n.8 (1970)).

Defendants argue that Ms. Tummings has no property interest in the LIHEAP and WAP benefits and, therefore, no entitlement to these programs. (Doc. 27 at 6.) Moreover, Defendants assert that, even if there were a property interest, Ms. Tummings was afforded due process through the HSB hearing. (Doc. 15 at 8.)

In *Kapps v. Wing*, the Second Circuit considered whether, in the administration of New York's Home Energy Assistance Program ("NYHEAP"), the defendant violated the procedural requirements of the Due Process Clause and the federal Low Income Energy Assistance Act ("the LIHEAA"). c, 108 (2d Cir. 2005). In assessing whether the plaintiffs had a property interest in the benefits under NYHEAP and LIHEAA, the *Kapps* court looked to the statutes and regulations governing the distribution of benefits. *Id.* at 113. The Second Circuit requires courts to consider whether the state statute or regulation at issue "meaningfully channel[s] official discretion by mandating a defined administrative outcome." *Id.* (quoting *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003)). If it does, a property interest will be found to exist. *Id.*

The Second Circuit found the federal LIHEAA did not, by itself, create a property interest because the statute "affords substantial discretion to the states, both in deciding whether to participate in the home energy program, and, if they choose to participate, in crafting their own state-level home energy laws." *Id.* The *Kapps* court found the New York state law, NYHEAP,

imposed "substantive predicates" limiting the decision-making of NYHEAP officials which conferred a constitutionally protected right. *Id.* at 114. The Second Circuit identified language in the New York state law, such as "once determined eligible a household *will* receive a regular [NYHEAP] benefit," and "social service districts '*shall be required* . . . to participate in the federal low-income home energy assistance program and *to assist eligible households*." *Id.* (first quoting N.Y. Comp. Codes. R. & Regs. Tit. 18, § 393.4(c); and then quoting N.Y. Soc. Serv. L. § 97[2]). Additionally, the *Kapps* Court noted that "all of the factors considered by the state in assessing individual [NYHEAP] eligibility are objective, and as such are ones over which HEAP administrators have no discretionary control." *Id.*

Importantly, the Second Circuit held that plaintiffs' status as applicants still entitled them to a property interest. *Id.* at 117. "[O]ur property interest analysis in the instant case extends only to the consideration of whether—were an applicant able to make out the requirements for [NYHEAP] eligibility—he or she would be entitled to benefits as a matter of law." The *Kapps* court further states, if the applicant is entitled, "state law creates a property interest," and the "applicant must be afforded procedural protections under the Due Process Clause to demonstrate his or her eligibility." *Id.* The Second Circuit also noted that the NYHEAP program is limited by the availability of federal funding, which means NYHEAP applicants are entitled to receive benefits, so long as the federal funding is available. *Id.* at 118.

There is, in this case, a similar state law affecting the implementation of the LIHEAP and WAP programs. *See* Vt. Stat. tit. 33, §§ 2601–2609. As such, the court will look to Vermont law to determine whether Ms. Tummings possesses a property right in the receipt of these benefits.

The ESD, a department of the Agency of Human Services, administers the Home Heating Fuel Assistance Program. Vt. St. tit. 33, § 2602(a). The Secretary of Human Services adopted

rules to implement the program pursuant to Vt. St. tit. 33, § 2602(b). *See* Vt. Dep't for Child. & Fams. Econ. Servs. Div., *Seasonal Fuel Assistance Rules*, Agency Hum. Servs. (June 6, 2024), https://outside.vermont.gov/dept/DCF/Shared%20Documents/ESD/Rules/2900-Seasonal-Fuel-Assistance.pdf?_gl=1*z3rxb3*_ga*MTEyMjc3NTI3My4xNzgxMDE0NDU1*_ga_V9WQH77KLW*czE3ODMzNDMxOTIkbzEyJGcwJHQxNzgzMzQzMjAwJGo1MiRsMCRoMA [https://perma.cc/35CA-47P6]. The Seasonal Fuel Assistance Rules provide that "[h]ouseholds *may be eligible* for fuel assistance benefits if they meet all . . . the criteria." *Id.* § 2903(a) (emphasis added). The rules then list the eligibility requirements, which include applicants must be Vermont residents, a household member must be a citizen, the total household gross income cannot exceed 185% of the federal poverty guidelines, and the head of the household "must spend at least 150 non-consecutive nights in their living unit between November 1 and April 30." *Id.* §§ 2903(a)(1)–(4). Under the "Application" section, the rules state "[a]pplications received by the [ESD] shall be used to determine benefit eligibility." *Id.* § 2905(c)(1). If the ESD has a question regarding an applicant's eligibility, the ESD "may require the household to provide additional evidence to verify one or more eligibility factors." *Id.* § 2908(a). The ESD "may withhold benefits, and may require benefits to be refunded, under any combination of the following circumstances," including if any member of the household "[s]pend[s] less than 150 nights in their living unit between November 1 and April 30." *Id.* § 2923(a)(3). "Regardless of a household's eligibility, the [ESD] may issue fuel benefits only if there are funds available that have been appropriated for fuel assistance payments." *Id.* § 2917(a). In addition, the rules provide Notice and Appeal rights for applicants which state "[a]n applicant or household that is aggrieved by any action or inaction of the [ESD] may request a fair hearing with the Human Services Board." *Id.* § 2926(a).

The Seasonal Fuel Rules, unlike the New York law, do not include the type of "discretion-limiting substantive predicates" which are "hallmarks" of a protected property interest. *Kapps*, 404 F.3d at 113. Instead, the ESD has discretion over which applicants to accept and can further evaluate an applicant's eligibility if needed. Because the benefits conferred by the ESD may be granted at the discretion of the ESD, the Vermont Home Heating Fuel Assistance Program likely does not give rise to a protected property interest.

Ms. Tummings has not alleged a protected entitlement to LIHEAP and WAP benefits. Although both programs provide federal funding for eligible individuals to receive certain services, the programs operate within limited funding constraints, and applicants must satisfy applicable eligibility requirements. Ms. Tummings acknowledges that she did not meet those requirements during the relevant period. As previously stated, the court finds the Seasonal Fuel Rules do not create a protected property interest in those benefits. Accordingly, Ms. Tummings has not established a property interest under the *Mathews* test and therefore cannot satisfy the threshold requirement for a procedural Due Process claim. She has likewise failed to demonstrate a likelihood of success on the merits of that claim.

**b. Discrimination Claims**

Ms. Tummings raises discrimination claims under 42 U.S.C. § 1981 and Title VI. She alleges Defendants' conduct rises to "intentional racial discrimination and/or has a racially disparate impact in violation of Title VI and 42 U.S.C. § 1981." (Doc. 4 at 6, ¶ 39.)

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

42 U.S.C. § 1981(a). To prevail under either statute, Ms. Tummings must demonstrate that (1) the Defendants discriminated against her based on race, (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for the Defendants' actions. *See Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001).

Ms. Tummings states that Defendants' "pattern of systematic denial, false homeownership challenges, fabricated fraud findings, and retaliatory conduct was motivated" by "racial discrimination." (Doc. 4 at 5, ¶ 32.) In support of her claims, Ms. Tummings describes "moving goalpost[s]" and requirements to prove her homeownership, which are "consistent with racially discriminatory skepticism applied disproportionately to Black applicants." (Doc. 21 at 3; Doc. 4 at 5, ¶ 33.) She alleges specifically that one CVOEO employee stated that "the agency did not believe she owned her home, despite Plaintiff having provided deed records and all requested documentation." (Doc. 18 at 4.) Ms. Tummings also states, "Black homeowners represent an exceptionally rare demographic in Vermont." (Doc. 4. at 5, ¶ 31.)

The court recognizes in a racial animus claim that the intent may be difficult to establish as "[t]here will seldom be 'eyewitness' testimony as to the [Defendants'] mental processes." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). The Second Circuit has articulated a test which allows a plaintiff to establish intent of discrimination by comparing their treatment to the treatment of a person who is similarly situated to the plaintiff in all material respects. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."); *see also*

*Gabriel v. Albany Coll. of Pharmacy & Health Scis. – Vermont Campus*, No. 2:12-cv-14, 2013 WL 4456690, at *6 (D. Vt. Aug. 16, 2013) (holding that a court could infer that similarly situated students were treated more favorably when a plaintiff asserted he was "singled out" for special treatment and the defendants had yet to show otherwise).

Although Ms. Tummings does not need to allege "specific facts establishing a *prima facie* case of discrimination" to survive a motion to dismiss, she must demonstrate a clear and substantial likelihood of success on the merits to be granted injunctive relief. *See Boykin v. KeyCorp*, 521 F.3d 202, 212 (2d Cir. 2008). Ms. Tummings identifies no facts suggesting intentional discrimination, nor does she present evidence that similarly situated applicants outside her protected group received more favorable treatment in connection with LIHEAP or WAP services. Instead, the evidence indicates that Defendants informed her of the eligibility requirements and identified the "work items" she needed to complete at her home before it could receive weatherization services. (Doc. 21 at 8.)

Because Ms. Tummings has not identified evidence establishing intentional discrimination or differential treatment, she has not shown a clear or substantial likelihood of success on the merits of her discrimination claims. The court does not discount the significance of her experiences or her observation that Black homeowners represent an exceptionally small proportion of Vermont homeowners. That circumstance standing alone, however, does not establish that Defendants acted with discriminatory intent or treated Ms. Tummings differently because of her protected status.

### c. Low-Income Home Energy Assistance Program Claims

Ms. Tummings alleges Defendants violated 42 U.S.C. § 8621 by denying benefits "to an eligible applicant without legal basis" and by "denying heating repair assistance in a manner that

foreseeably caused Plaintiff to incur an unaffordable private utility debt that has locked her out of further assistance." (Doc. 4 at 6, ¶ 43.) Defendants contend her LIHEAP claim is barred by the doctrine of collateral estoppel because the HSB affirmed her denial. (Doc. 15 at 4–5; Doc. 27 at 8.)

"The fundamental notion of the doctrine of collateral estoppel, or issue preclusion, is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the parties or their privies." *Constantine v. Tchrs. Coll.*, 448 F. App'x 92, 93 (2d Cir 2011) (quoting *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008)). When the issue is first resolved by a "state agency acting in a judicial capacity," and "the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Locurto v. Giuliani*, 447 F.3d 159, 170 (2d Cir. 2006) (quoting *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)). In considering whether the doctrine of issue preclusion applies to bar disputes in federal question cases, the court turns to the "uniform federal rules of res judicata." *Taylor v. Sturgell*, 553 U.S 880, 891 (2008) (citation modified).

The Supreme Court has held that, when a state agency "acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Elliott*, 478 U.S. at 799 (citation modified); *see also Brod v. Omya, Inc.*, No. 2:05-cv-182, 2006 WL 8426527, at *14 (D. Vt. June 22, 2006). The Vermont Supreme Court has held "an administrative judgment can have preclusive effect in a judicial proceeding." *Trickett v. Ochs*, 2003 VT 91, ¶ 11, 176 Vt. 89, 838 A.2d 66; *see also In re P.J.*, 2009 VT 5, ¶ 8, 185 Vt. 606, 969 A.2d 133 (2009) ("Collateral estoppel may apply in

administrative proceedings." (citing *In re Stormwater NPDES Petition*, 2006 VT 91, ¶ 23, 180 Vt. 261, 910 A.2d 824)).

Under Vermont law, collateral estoppel applies when the following criteria are met:

> (1) preclusion is asserted against one who was a party . . . in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*In re P.J.*, 2009 VT 5, ¶ 8, 185 Vt. 606, 969 A.2d 133 (quoting *Trepanier v. Getting Organized, Inc.*, 583 A.2d 583, 587 (Vt. 1990)).

ESD and CVOEO are asserting preclusion against Ms. Tummings, who was a party to the HSB decision. The HSB decision was a final decision on the merits and addressed whether Ms. Tummings was properly denied benefits for failing to satisfy the applicable eligibility requirements. *In re Tummings*, FH-B-02/26-157. Here, Ms. Tummings raises that same issue in her LIHEAP claim.

Ms. Tummings contends the issue before the HSB was not the same because it did not consider her allegations of civil rights and constitutional violations or racial discrimination allegations. (Doc. 18 at 3.) Her LIHEAP claim, however, alleges that "Defendants failed to comply with the LIHEAP requirements by denying benefits to an eligible applicant without legal basis." (Doc. 4 at 6, ¶ 43.) Thus, issue preclusion bars Ms. Tummings from relitigating whether Defendants improperly denied her LIHEAP benefits. It does not, on this basis alone, resolve any distinct claims or allegations that were not actually litigated and decided in the HSB proceeding.

Additionally, Ms. Tummings had a full and fair opportunity to litigate the issue before the HSB. As Defendants explain, "[p]roceedings before the HSB hearing officer include notice, an

opportunity to present evidence and confront witnesses, and many other trial-like features." (Doc. 15 at 7 (citing the HSB Fair Hearing Rules)).

Ms. Tummings argues the HSB proceeding did not afford her a full and fair opportunity to litigate the issue. (Doc 18 at 3.) "[T]he requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard." *Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971). Vermont courts do not apply a single dispositive test but consider several factors, including "the choice of the forum, the incentive to litigate, the foreseeability of future litigation, the legal standards and burdens in each action, the procedural opportunities of each forum, and the possibility of inconsistent determinations." *In re P.J.*, 2009 VT 5, ¶ 13, 185 Vt. 606, 969 A.2d 133 (citing *In re Tariff Filing of Cent. Vt. Pub. Serv. Corp.*, 769 A.2d 668, 681 (Vt. 2001)).

The HSB Fair Hearing Rules provide procedural safeguards designed to ensure a fair adjudication. The rules require that hearings be conducted by an impartial hearing officer appointed by the HSB who had no involvement in the underlying action. Human Service Board, *Fair Hearing Rules*, (Sep. 1, 2008), https://humanservices.vermont.gov/sites/ahsnew/files/fair-hearing-rules-1.pdf [https://perma.cc/S6DL-CMCU]. They also afford appellants the opportunity to retain counsel, provide notice of the hearing's date and time, and require that appellants receive a copy of the governing rules. *Id.* In addition, appellants can present evidence at the hearing, subject to the applicable evidentiary rules. *Id.* These procedures provided Ms. Tummings with notice of the proceeding, a neutral decision-maker, an opportunity to obtain representation, and a meaningful opportunity to present evidence and contest the denial of benefits.

Ms. Tummings elected to represent herself at the HSB hearing. Her decision to proceed without counsel does not, standing alone, establish that she lacked a full and fair opportunity to

litigate the issue. Self-representation may warrant construing a party's submissions liberally, but it does not eliminate the preclusive effect of an otherwise fair adjudicatory proceeding. The relevant question is whether the procedures available to Ms. Tummings afforded her a meaningful opportunity to present her position, not whether she ultimately chose to take advantage of every available procedural safeguard. Nothing before the court indicates that Ms. Tummings lacked notice of the hearing, was prevented from presenting evidence, or was denied an opportunity to challenge the denial of benefits.

Accordingly, the HSB proceeding afforded Ms. Tummings a full and fair opportunity to litigate whether Defendants properly denied her LIHEAP benefits for failure to satisfy the applicable eligibility requirements. Because that issue was decided in the HSB proceeding, Ms. Tummings is collaterally estopped from relitigating it here. She therefore cannot demonstrate a clear and substantial likelihood of success on the merits of her claim.

**d. Weatherization Assistance Program Claims**

Ms. Tummings asserts a claim under the Weatherization Assistance Program ("WAP"), alleging that Defendants failed to provide weatherization services to her residence "despite repeated applications, documented need, and foreseeable property damage." (Doc. 4 at 7, ¶ 45.) Defendant CVOEO contends this claim is likewise precluded because eligibility for WAP services requires an applicant to first qualify for LIHEAP. (Doc. 27 at 9.) At the hearing, Defendant ESD also argued that Ms. Tummings failed to appeal the HSB decision and, therefore, did not exhaust her available administrative remedies.

The Vermont Supreme Court has "consistently held that when administrative remedies are established by statute or regulation, a party must pursue, or 'exhaust,' all such remedies before turning to the courts for relief." *Jordan v. State Agency of Transp.*, 702 A.2d 58, 60 (Vt. 1997)

(citing *In re D.A. Assocs.*, 547 A.2d 1325, 1326 (Vt. 1988)). The exhaustion doctrine promotes judicial efficiency and conserves judicial resources by allowing agencies to address issues within their expertise before those issues reach the courts. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). In Vermont, exhaustion is generally required when an agency has jurisdiction to decide the issue and the party seeking judicial review bears the burden of demonstrating that an exception applies. *Jordan*, 702 A.2d at 60.

Ms. Tummings concedes she did not appeal any decision concerning the weatherization program. She instead relies on *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496 (1982), to support her contention that exhaustion is not required for these claims.

In *Patsy*, the Supreme Court held that plaintiffs asserting federal civil rights claims under § 1983 do not need to exhaust available administrative processes before bringing those claims in federal court. *Id.* at 500–01. The rule applies to claims properly brought under § 1983; it does not automatically excuse a plaintiff from pursuing an administrative appeal concerning eligibility for government benefits. Thus, to rely on *Patsy* in order to avoid the HSB appeal process, Ms. Tummings must demonstrate that her WAP claim asserts the violation of a specific, enforceable federal right and is properly cognizable under § 1983, rather than challenging the agency's determination that she did not qualify for weatherization services.

The Eleventh Circuit has held that 42 U.S.C. §§ 6681(b) and 6863(a), provisions of the Energy Conservation and Production Act that authorize financial assistance to low-income individuals for energy conservation measures, do not create a federal right enforceable under 42 U.S.C. § 1983. *Houston v. Williams*, 547 F.3d 1357, 1363 (11th Cir. 2008). Accordingly, this court concludes that the exemption to the exhaustion requirement recognized in *Patsy* does not

apply here. Ms. Tummings was required to pursue the available administrative appeal concerning her WAP eligibility.

The HSB Fair Hearing Rules provide a procedure for appealing a final decision to the Vermont Supreme Court. Ms. Tummings did not appeal the decision concerning her eligibility for weatherization services. As a result, she failed to exhaust the administrative remedies available to her and has not demonstrated a clear and substantial likelihood of success on the merits of her WAP claim.

**e. Negligence Claim**

Ms. Tummings raises a negligence claim against the Defendants under Vermont law alleging they breached their "duty of care in administering heating and weatherization programs." (Doc. 4 at 7, ¶ 49.) She contends that Defendants' denial of her initial heating repair request directly and proximately caused her unpaid Vermont Gas debt and resulting termination of gas service to her home. (*Id.*) She further alleges the subsequent denials are the "direct and proximate cause of burst pipes, water heater failure, loss of hot water, and [her] current uninhabitable living conditions." (*Id.*)

Under Vermont law, a negligence claim requires: (1) "a legal duty owed by defendant to plaintiff," (2) "a breach of that duty," (3) "actual injury to the plaintiff," and (4) "a causal link between the breach and the injury." *Zukatis by Zukatis v. Perry*, 682 A.2d 964, 966 (Vt. 1996) (citing *O'Connell v. Killington, Ltd.*, 665 A.2d 39, 42 (Vt. 1995)). "The existence of a duty 'is primarily a question of law.'" *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 6, 197 Vt. 176, 102 A.3d 1101 (quoting *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 968 A.2d 336); *see also Keegan v. Lemieux Sec. Servs., Inc.*, 2004 VT 97, ¶ 7, 177 Vt. 575, 861 A.2d 1135 ("[W]hether

the law imposed upon defendants a duty of care" is a "determination the trial court must make as a matter of law.").

Vermont common law defines the duty of ordinary care by reference to the degree of care that a reasonably prudent person would exercise in similar circumstances. *See Edson v. Barre Supervisory Union No. 61*, 2007 VT 62, ¶ 10, 182 Vt. 157, 933 A.2d 200 (citing *LaFaso v. LaFaso*, 223 A.2d 814, 817–18 (1966)). The scope of that duty depends on whether the consequences of the defendant's conduct were reasonably foreseeable. *Id.*

Defendants argue that Ms. Tummings has not established that they owed her a legal duty. (Doc. 27 at 10–11.) Defendant CVOEO maintains it is a nonprofit that "administers LIHEAP and WAP [sic] funding based on regulatory strictures" and approved applications. (*Id.* at 11.) Ms. Tummings contends CVOEO "affirmatively approved" her for weatherization services and "placed her on a waitlist." (Doc. 29 at 3.) She also relies on the theory that a duty may arise when a defendant voluntarily undertakes to provide services. (*Id.*)

Whether a legal duty exists depends on a variety of factors, including considerations of public policy. *Langle v. Kurkul*, 510 A.2d 1301, 1305 (1986). The "foreseeability of the risk is a primary consideration." *Id.* (quoting *Coulter v. Superior Ct.*, 577 P.2d 669 (1978), *superseded by legislative action* (2002)). Vermont courts also consider:

> [T]he degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.* The Vermont Supreme Court has further cautioned that courts should "not recognize a new cause of action or enlarge an existing one without first determining whether there is a compelling public policy reason for the change." *Id.* at 1305–06.

CVOEO's alleged conduct does not establish a legal duty to provide Ms. Tummings with weatherization services. The record indicates that CVOEO placed Ms. Tummings on a waitlist and informed her that she first had to address certain conditions at her home, including electrical work, before the weatherization services could proceed. Those facts may demonstrate that CVOEO evaluated her application or communicated the program's requirements, but they do not show that CVOEO assumed an obligation to provide services regardless of whether those conditions were satisfied. Nor does placing Ms. Tummings on a waitlist constitute a guarantee that she would receive the requested services.

Recognizing a duty under these circumstances could effectively require CVOEO to provide weatherization services whenever an applicant was placed on a waitlist, even when the applicant had not satisfied the program's eligibility requirements or prerequisites. The court declines to create such a duty in the absence of a statutory, regulatory, or common law basis for doing so. Because Ms. Tummings has not established the first element of her negligence claim, she has not demonstrated a clear or substantial likelihood of success on the merits.

**f. Intentional Infliction of Emotional Distress Claim**

Ms. Tummings' final claim alleges that Defendants intentionally inflicted emotional distress. (Doc. 4 at 7, ¶ 51.) She contends the Defendants' alleged fabricated fraud determination, prolonged denial of essential heating benefits, refusal to remedy the resulting harm during the HSB proceeding, and continued indifference to her unsanitary and uninhabitable living conditions constitute extreme and outrageous conduct. (*Id.*) She further alleges that this conduct caused her severe emotional distress, including "panic, anxiety, and mental anguish." (*Id.*)

Under Vermont law, to prevail on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show the "defendants engaged in outrageous conduct, done intentionally

or with reckless disregard of the probability of causing emotional distress," which results "in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 848 A.2d 344. The plaintiff bears a "heavy" burden to show the defendants' conduct "was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Id.*

A plaintiff must demonstrate that the "harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). This objective test is a "threshold question" that the court determines. *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002).

Ms. Tummings argues that she is a vulnerable applicant who relied on the approval of these benefits and suffered severe emotional distress when those benefits were not provided over a five-year period. (Doc. 29 at 3, ¶ VII.) The Vermont Supreme Court has recognized that a less demanding standard may apply when a defendant knows that a plaintiff is particularly susceptible to emotional distress. *Denton v. Chittenden Bank*, 655 A.2d 703, 707 (Vt. 1994). Ms. Tummings, however, has presented no evidence that Defendants knew she was particularly susceptible to emotional distress. Moreover, her status as a vulnerable applicant does not, without more, establish that Defendants' conduct was outrageous or otherwise alter the applicable standard.

The court does not minimize the seriousness of Ms. Tummings' living conditions or the emotional distress she describes. An IIED claim, however, turns on whether the defendant's conduct itself was sufficiently outrageous. The record indicates that Ms. Tummings did not satisfy the eligibility requirements for the assistance she sought and that she was informed that certain repairs had to be completed before her home could receive weatherization services. On this record,

the court cannot conclude that Defendants' conduct was "so outrageous in character and so extreme in degree" as to support an IIED claim. *Fromson*, 2004 VT 29, ¶ 14, 176 Vt. 395, 848 A.2d 344. Ms. Tummings therefore has not satisfied the threshold requirement for such a claim and has not demonstrated a clear and substantial likelihood of success on the merits.

* * * *

For the foregoing reasons, Ms. Tummings has not shown a clear or substantial likelihood of success on her constitutional, discrimination, LIHEAP, WAP, or tort claims. Because she has not satisfied this threshold requirement, her motion for preliminary injunction must be denied.

**4. Balance of Hardships and Public Interest**

Although Ms. Tummings' failure to establish irreparable harm and a clear and substantial likelihood of success is sufficient to deny her motion, the court will also consider the balance of the equities. As explained below, that balance likewise does not favor granting preliminary injunctive relief.

The final factor the court must consider is whether the balance of equities tips in the plaintiff's favor and that the injunction would serve the public interest. *See Daileader*, 96 F.4th at 356. Ms. Tummings asserts that she is a low-income homeowner who is "living without hot water," has been "displaced from her own property," and is "suffering daily" as a result of Defendants' conduct. (Doc. 5 at 3.) The living conditions Ms. Tummings has described are undoubtedly concerning. The court, nevertheless, cannot conclude that the public interest favors ordering Defendants to provide services for which Ms. Tummings is not eligible. The CVOEO and ESD have limited funds that they use to provide benefits to eligible applicants.

The court also notes ESD's counsel's observation that this action may not be the appropriate avenue for addressing Ms. Tummings' circumstances. The court reiterates that

observation and encourages Ms. Tummings to consider reapplying for assistance if she meets the applicable eligibility requirements.

**B. Motions to Dismiss for Failure to State a Claim**

**1. Legal Standard**

Defendants have moved to dismiss Ms. Tummings claims pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 15; Doc. 27.) On a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). This requirement, however, does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, a plaintiff is required to support their claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal quotation marks omitted)). A court must determine whether a complaint states a plausible claim for relief by looking to the specific context. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)).

Where, as here, a plaintiff proceeds *pro se*, the court "must construe [her complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). In deciding a motion to dismiss a *pro se* complaint, it is appropriate to consider certain "materials outside the

complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-cv-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including "documents that a *pro se* litigant attaches to [their] opposition papers." *Agu v. Rhea*, No. 09-cv-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010). "[T]he liberal treatment afforded to pro se litigants," however, "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (citation modified); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("We recognize that the right to appear *pro se* should not be impaired by harsh application of technical rules, and therefore we make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training. Nonetheless, *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them." (citation modified)).

**2. Counts I, III, & VI – Constitutional Claims**

**a. Section 1983 Claims**

Ms. Tummings asserts three civil rights claims. (Doc. 4 at 6–7.) As a preliminary matter, Count I is captioned "Deprivation of Federal Rights Under Color of State Law." (*Id.* at 6.) The claim states, "Defendants acted under the color of state law" and "[t]heir wrongful denial of heating repair assistance, continued denial of fuel and weatherization assistance, fabrication of a fraud determination, and retaliation against" Ms. Tummings constitutes a "deprivation of rights secured by federal law and the U.S. Constitution, actionable under 42 U.S.C. § 1983." (*Id.* at 6, ¶ 37.)

Although not explicitly clear, the court understands this claim, in part, to seek relief under Section 1983 for violations of LIHEAA, 42 U.S.C. §§ 8621–8630, which assists states in providing

home energy assistance to low-income households, and WAP, 42 U.S.C. §§ 6861–6873, which assists states in providing weatherization services to low-income individuals.

"Section 1983 'is not itself a source of substantive rights.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Instead, "[i]t merely provides a method for vindicating federal rights elsewhere conferred." *Id.* Thus, to prevail on a claim under Section 1983, a plaintiff "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

In *Kapps*, the Second Circuit declined to decide whether § 8624(b)(13), which requires states to provide fair administrative hearings to individuals denied assistance, creates rights enforceable under § 1983. *Kapps*, 404 F.3d at 127. The *Kapps* court explained the answer "is not an easy one." *Id.* The court further explained that "[o]n the one hand . . . § 8624(b)(13) has many of the characteristics that the Supreme Court has identified as important to the creation of privately enforceable statutory rights." *Id.* While, "[o]n the other hand, the Court has appeared to be increasingly reluctant to find § 1983—enforceable rights in statutes which, like the LIHEAA, set forth their requirements in the context of delineating the obligations that accompany participation in federal spending clause programs." *Id.* The Eastern District of New York, after the *Kapps* decision, held that LIHEAA does not confer a private right enforceable under § 1983. *Boyland v. Wing*, 487 F. Supp. 2d 161, 167, 171 (E.D.N.Y. 2007) ("[T]he Court finds that there is nothing in the language or the structure of LIHEAA that would demonstrate that Congress was unambiguously conferring a right that could support an action under Section 1983 and, thus, no such cause of action exists."). With respect to WAP, the Eleventh Cicuit held in *Houston v. Williams* that 42 U.S.C. §§ 6861(b) and 6863(a), provisions addressing the program's purpose and implementation, do not create rights enforceable under § 1983. *Houston*, 547 F.3d at 1362–63.

The court need not resolve whether LIHEAA or WAP confer rights enforceable under Section 1983, because, as explained below, Ms. Tummings fails to plausibly allege claims under either statute. *See infra* pp. 41–42. The remaining portion of Count I seeks relief under § 1983 for alleged constitutional violations, claims Ms. Tummings also asserts in Counts II and VI. Because Ms. Tummings agrees that it should be consolidated with her other § 1983 claims, (Doc. 29 at 1), Count I is dismissed as duplicative and for failure to state a claim.

In Count III, Ms. Tummings asserts that Defendants violated her constitutional rights in under of 42 U.S.C. § 1983. (Doc. 4 at 6, ¶ 41.) Specifically, she alleges Defendants discriminated against her on the basis of race in violation of the Equal Protection Clause. (*Id.*)

"Section 1983 gives a cause action to any person who has been deprived of [her] constitutional rights, privileges or immunities under color of state law." *Powell v. Workmen's Comp. Bd. of State of N.Y.*, 327 F.2d 131, 135 (2d Cir. 1964). The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

As previously articulated, claims alleging violations of an individual's constitutional rights under 42 U.S.C. § 1983 may only be brought against state actors. *See Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." (citation modified)); *see also* 42 U.S.C. § 1983 (imposing civil liability on someone who "undercolor of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.") Thus, a private actor will not be

held liable under § 1983 unless it was acting as an instrument of the state. *See Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003).

The court has already concluded that Ms. Tummings has not made a clear or substantial showing of a likelihood of success on her constitutional claims against CVOEO because CVOEO is not a state actor. Although the standard differs from that governing preliminary injunctive relief, the court's prior finding remains relevant.

The Complaint acknowledges CVOEO is a "Vermont nonprofit corporation." (Doc. 4 at 2, ¶ 5.) Apart from alleging that CVOEO is a "state-designated Community Action Agency" who is "responsible for administering the funds," the Complaint contains no specific allegations connecting CVOEO's conduct to the state. Instead, it offers the conclusory assertion that "CVOEO acts under color of state law." (Doc. 4 at 3, ¶ 5.) Such a "[t]hreadbare recital[] of the elements of a cause of action" is insufficient. *Iqbal*, 556 U.S. at 678.

Nor does CVOEO's administration of federal funds, standing alone, suffice to state a § 1983 claim against a private entity. *See Blum*, 457 U.S. at 1004; *Etuk v. City of New York*, No. 23 Civ. 4957, 2026 WL 366763, at *10–*11 (S.D.N.Y. Feb. 10, 2026) (holding social services organizations, even under contract with the state or subject to state regulation, does not turn the organizations into state actors); *Crisis Ctr. N., Inc.*, 2026 WL 2137131, at *8–*9 ("[T]he court finds dismissal at this stage is premature . . . because [the plaintiff's] allegations at least give rise to the inference that [the state] encouraged and exercised some joint participation in the general monitoring of the grant agreement and the ultimate decision not to renew that grant agreement."). Ms. Tummings alleges no comparable facts here. Ms. Tummings has failed to meet her burden to plausibly allege that CVOEO was a state actor engaged in state action when they allegedly violated her constitutional rights under § 1983.

Having concluded that Ms. Tummings has not plausibly alleged state action by CVOEO, the court turns to her Equal Protection claim against ESD. As previously stated, and because ESD is a Vermont state agency, the state-action requirement is satisfied as to ESD. Her § 1983 claim against ESD nevertheless fails because she has not plausibly alleged that ESD's actions were racially motivated.

"[C]laims of race-based discrimination under the Equal Protection Clause . . . require that intentional discrimination be alleged in a non-conclusory fashion." *Clyburn v. Shields*, 33 F. App'x 552, 555 (2d Cir. 2002) (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)). Thus, a plaintiff must allege facts supporting a plausible inference that the challenged conduct was intentionally discriminatory. *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015) (affirming dismissal of an equal protection claim where plaintiff "fail[ed] to allege in other than conclusory fashion any specific instances of discrimination with respect to any individual plaintiff or others similarly situated"). As previously explained, Ms. Tummings has not plausibly alleged that ESD's actions were motivated by racial animus. *See supra* at pp. 13–14; *see also Burwell v. Peyton*, No. 5:12-cv-166, 2013 WL 1386290, at *6 (D. Vt. Apr. 4, 2013) ("It is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened because the person is a member of that racial group. Even though there is a reasonable inference that the Defendant Officers were aware of [the plaintiff's] race as they approached the scene and that the Defendant Officers were clearly aware of his race once they entered his residence, there are no factual allegations that make it plausible that such knowledge of his race was a motivating factor in their actions." (citation modified)).

The Complaint claims, in a conclusory statement, that ESD denied Ms. Tummings' applications "on the basis of her race and her prior exercise of administrative appeal rights." (Doc. 4 at 3, ¶ 10.) It identifies no facts connecting ESD's decisions to Ms. Tummings' race and does not allege that ESD treated her differently from similarly situated individuals outside her protected class. Moreover, at the hearing on the motions, Ms. Tummings conceded she did not meet the eligibility criteria to receive the benefits at issue. Because Ms. Tummings' factual allegations do not give rise to an inference of discrimination strong enough to move her claims "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570), her § 1983 claims against both Defendants must be dismissed.

**b. Due Process Claim**

In Count VI, Ms. Tummings alleges Defendants violated her due process rights under the Fourteenth Amendment. (Doc. 4 at 7, ¶¶ 46–47.) "The two threshold questions in any § 1983 claim for denial of procedural due process are whether the plaintiff possessed a liberty or property interest protected by the United States Constitution . . . and, if so, what process was due before the plaintiff could be deprived of that interest." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995).

As discussed above, the Seasonal Fuel Rules do not give rise to a protected property interest. *See supra* pp. 17–19. The Rules give ESD substantial discretion in administering the programs and provide only that eligible applicants "may" receive assistance. That discretionary language does not create a legitimate claim of entitlement to benefits. Instead, it leaves the provision of assistance contingent on eligibility determination, available funding, and the agency's administration of the programs. Ms. Tummings therefore cannot plausibly allege that she possessed a constitutionally protected property interest in the benefits at issue.

Furthermore, even if Ms. Tummings were somehow able to plausibly allege that the Seasonal Fuel Rules created an entitlement to these services, her procedural due process claim would still fundamentally fail because she has not alleged that Defendants deprived her of that interest without constitutionally adequate process. Ms. Tummings alleges that she was denied these benefits "without adequate notice, without accepting Plaintiff's documentation in good faith, and without constitutionally sufficient process." (Doc. 4. at 7, ¶ 47.) The record before the court, however, indicates Ms. Tummings attended an HSB hearing and had the opportunity to challenge the denial of her LIHEAP benefits. The hearing provided her an opportunity to present her position and contest the denial. In addition, as discussed above, Ms. Tummings did not pursue the available administrative remedies with respect to her WAP claims. *See supra* pp. 26–27. She, therefore, has not plausibly alleged that ESD denied her the process required by the Constitution.

Accordingly, Ms. Tummings has failed to state a procedural due process claim against either Defendant. Count VI is dismissed.

**3. Count II – Racial Discrimination Claims**

In Count II, Ms. Tummings asserts discrimination claims against CVOEO and ESD pursuant to 42 U.S.C. § 1981 and Title VI. (Doc. 4 at 6, ¶ 39.) At the pleading stage, a plaintiff need not allege "specific facts establishing a *prima facie* case of discrimination." *Boykin*, 521 F.3d at 212 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)). The Supreme Court, in *Swierkiewicz*, held a complaint alleging discrimination "easily" satisfied Rule 8(a) because it provided the defendant with "fair notice of the basis" for the plaintiff's claim by alleging that the plaintiff had "been terminated on account of his national origin, . . . detail[ing] the events leading to his termination, provid[ing] relevant dates, and includ[ing] the ages and nationalities of at least some of the relevant persons involved with his termination." *Swierkiewicz*, 534 U.S. at 514. For

Title VI cases, this remains the pleading threshold in the Second Circuit. *See Boykin*, 521 F.3d at 213; *see Gabriel*, 2013 WL 4456690, at *5 ("As Title VI and Title VII cases employ the same analytical framework, the same pleading standard applies here."); *see also Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 72 (2d Cir. 2006).

Although a plaintiff need not plead a *prima facie* case of discrimination, she must still allege facts that make intentional discrimination plausible. *See Gabriel*, 2013 WL 4456690, at *6 (noting the Second Circuit's decision in *Boykin* "demonstrates that a plaintiff in a discrimination case need not provide factual *evidence* of discrimination in his Complaint"). *Boykin* does not eliminate that requirement. There, the Second Circuit found complaints alleging racial discrimination are "sufficiently pleaded when the complaint state[s] simply that plaintiffs 'are African-Americans, describe[s] defendants' actions in detail, and allege[s] that defendants selected [plaintiffs] for maltreatment 'solely because of their color.'" *Boykin*, 521 F.3d at 215 (quoting *Phillip v. Univ. of Rochester*, 316 F.3d 291, 298 (2d Cir. 2003)). The Second Circuit further observed that, "even after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Id.* at 216.

Ms. Tummings, in her Complaint, has asserted her status as a member of a protected class and that Defendants' alleged challenges to her homeownership and residency, as well as their continued denial of services, "constitutes intentional racial discrimination and/or has a racially disparate impact." (Doc. 4 at 6, ¶ 39.) The Complaint, however, does not identify facts connecting those actions to Ms. Tummings race. As previously stated, the Complaint does not allege any facts establishing intentional discrimination. *See supra* pp. 20– 21. At most, the allegations indicate that ESD denied Ms. Tummings' application because she did not satisfy the applicable eligibility requirements, a fact Ms. Tummings concedes. Ms. Tummings also acknowledges that she did not

appeal the denial of WAP benefits. To the extent Ms. Tummings relies solely on a disparate-impact theory, that theory likewise does not satisfy § 1981's requirement of intentional discrimination.

The merits of her claim, on its face, fail to present a plausible allegation of disparate treatment and, therefore, are unsustainable. Count II is dismissed.

#### 4. Counts IV & V – Low-Income Home Energy Assistance and Weatherization Assistance Programs Claims

Count IV and Count V allege violations of the LIHEAP, 42 U.S.C. § 8621–8630, and the WAP, 42 U.S.C. §§ 6861–6873, respectively. (Doc. 4 at 6, 7, ¶¶ 43, 45.) As previously stated, however, neither 42 U.S.C. §§ 6861–6873 nor §§ 8621–8630 provides a private right of action, which is a threshold requirement for the viability of these claims. *See supra* p. 35.

Even if the court were to find that these statutes confer a private right of action, the claims would still fail under the plausibility standard. Ms. Tummings has not alleged sufficient facts to state a claim upon which relief can be granted. First, the court has already determined the LIHEAP claim is precluded by collateral estoppel. *See supra* pp. 23–25. Additionally, the court has previously found Ms. Tummings failed to exhaust the administrative remedies required to pursue her WAP claim. *See supra* pp. 25–27.

For the reasons set forth above, Count IV and V are dismissed.

#### 5. Counts VII & VIII – Remaining State Law Claims

With the federal claims dismissed, the court turns to the state law claims. Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim or claims if one of four enumerated circumstances arise. Specifically, § 1367(c)(3) provides that a district "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." *Itar-Tass Russian News*

*Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446 (2d Cir. 1998). Section 1367(c) is permissive, not mandatory. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011). Where any of the four enumerated bases for declining supplemental jurisdiction is found, as is the case here, the court may consider any number of other factors when deciding whether to decline jurisdiction. *Id.*

"When all federal claims are dismissed, district courts should generally decline to exercise supplemental jurisdiction over pendent state law claims." *Collins v. Feder*, No. 3:23-cv-71, 2024 WL 5058435, at *7 (D. Conn. Dec. 10, 2024). Accordingly, the court can decline to exercise supplemental jurisdiction over Ms. Tummings' remaining state law claims.

Notwithstanding the jurisdictional declination, the state law claims would nonetheless fail on the merits. The Complaint fails to allege plausible facts to support a claim for negligence. As the court has already determined Ms. Tummings has not established that the Defendants owed her a legal duty. (Doc. 29 at 3, ¶ VI; *see also supra* pp. 28–29.) Second, as previously stated, Ms. Tummings' claims regarding emotional distress fail to meet the high threshold required under Vermont law. As such, Ms. Tummings' remaining state law claims are dismissed.

**CONCLUSION**

Ms. Tummings has requested leave to amend her pleadings in the event that the court grants the motions to dismiss. (Doc. 18 at 6.) In support of this request, she asserts that amendment would not be futile and directs the court's attention to the evidence submitted. (*Id.*) The court disagrees. Leave to amend is improper when such an amendment would be futile. Here, the deficiencies in the Complaint are legal rather than factual; no amendment could state a claim upon which relief can be granted. Because no factual allegation could overcome the legal bars identified by the court, any amendment would be futile.

Plaintiff's Motion for a Preliminary Injunction (Doc. 5) is DENIED. Defendants' Motions to Dismiss for Failure to State a Claim (Docs. 15 & 27) are GRANTED.

DATED at Rutland, in the District of Vermont, this 19th day of October 2026.

Mary Kay Lanthier
United States District Judge